JOHN A. PRICHARD ET AL., Appellants, v. THE BOARD OF SUPERVISORS OF WOODBURY COUNTY and WOLF CREEK DRAINAGE DISTRICT, Appellees, THE BOARD OF SUPERVISORS OF MONONA COUNTY ET AL., Intervenors, Appellants.

**Drainage:** APPEAL: INTERVENTION: JURISDICTION. The district court in drainage proceedings is simply an appellate tribunal without any original jurisdiction and can not therefore entertain a petition of intervention filed in that court on appeal. And the objectors to the establishment of a drainage district are confined on appeal to the objections filed before the board of supervisors.

**Same:** FORMATION OF DISTRICT: PETITION: NUMBER OF SIGNERS. The petition in drainage proceedings instituted under section 1989a1

*et seq.* .of the Code Supplement, need not be signed by a majority of resident owners of land within the proposed district, but is sufficient if signed by one such land owner.

**Same:** SURVEY: EMPLOYMENT OF ASSISTANTS. It is not essential that the surveyor appointed by the supervisors to make a survey of the proposed district shall perform all of the work personally, but he may'entrust the work in a large measure to assistants acting under his general direction; and where, as in this case, the surveyor went over the ground, set the stakes and assisted part of the time in the actual work of running levels there was a sufficient compliance with the statute.

**Same:** TERRITORY INCLUDED IN THE DISTRICT. Lands already included in a drainage district may be made a part of another newly established district.

**Same:** APPEAL: QUESTIONS NOT RAISED BELOW. An objection that the supervisors failed to have a permanent survey. of the district made can not be raised for the first time on ·appeal.

**Same:** ESTABLISHMENT OF DRAINAGE DISTRICT: REVIEW OF PROCEEDINGS. In proceedings to establish a drainage district, under the provisions of section 1989a1 of the Code Supplement *et seq.,* the board of supervisors act largely in a legislative capacity, and the court will not interfere with its action in establishing a district, on the ground that the drain will not be of public utility or too great a burden upon the lands of the district, unless the evidence clearly establishes such facts; and where the supervisors determine that a system of drainage, if established, will drain surface waters from the agricultural lands therein, and. the evidence tends to sustain such finding, it will be presumed on appeal that the system will be a public benefit and conducive to public welfare.

**Same:** DRAINS: OUTLET. In the establishment of a drainage system under the section of the statute referred to above, an existing district may be extended, parts of the land therein may be included in a new district, natural streams may be changed and waters collected in one district from lands higher up the stream may be turned into ditches lower down, and the lower ditch thus used may be deepened or enlarged to meet the necessities of the case as an outlet.

**Same:** WHO MAY OBJECT TO THE ESTABLISHMENT OF DRAINAGE DISTRICT. Although a ditch previously established may not be sufficient to take care of the water it was originally planned to carry, and that coming from a proposed new district, still this question can only be raised ·by parties to the proceedings for the establishment of .the. new. district whose lands are included therein, and who

made proper objections before the supervisors. Owners of land within the old district can not raise this question by intervention on appeal.

**Same:** DRAINAGE: SUFFICIENCY: EVIDENCE. In this action the evidence is held insufficient to justify the holding, as a matter of law, that the plan for the new district will not be sufficient to take care of the surface water and that the old ditch will be insufficient to carry it without overflow.

**Same:** BENEFITS: EQUALIZATION OF ASSESSMENTS: PRESUMPTION. Where it fairly appears that all the land included within a proposed drainage district will receive some benefit therefrom, it will be presumed on appeal that the difference in benefits will be adjusted by the supervisors in making assessments against the land.

**Same:** BENEFITS: DISCRETION OF SUPERVISORS: REVIEW. The supervisors have a wide discretion in determining whether lands included within a proposed drainage district will be benefited, and its order establishing the district will not be set aside on the ground that the lands will not be benefited, unless the evidence clearly establishes that fact.

*Appeal from Woodbury District Court.*—HON. DAVID MOULD, Judge.

THURSDAY, FEBRUARY. 9, 1911.

THIS is an appeal from a judgment of the district court affirming and confirming the action of the board of supervisors of Woodbury County in establishing what is known as the "Wolf Creek Drainage District" in said county. There was an intervention in the district court, and the petition of the interveners was dismissed. The objectors to the establishment of the drainage district and the interveners appeal.—*Affirmed.*

*J. S. Lothrop* and *J. A. Prichard,* for appellants.

*W. G. Sears* and *Henderson & Fribourg,* for appellees.

DEEMER, J.—The board of supervisors of Woodbury

County, upon a petition signed by various landowners, established what is known as the "Wolf Creek Drainage District" in said county. This was after a survey and plan had been made by a competent engineer and over the objection of certain landowners. Some of these objectors appealed to the district court, and, when the case reached that court, the county of Monona, the board of supervisors thereof, and various landowners filed a petition of intervention, in which they asked that the entire proceedings be dismissed, that the order of the board of supervisors of Woodbury County be set aside and annulled, and that the said board be enjoined from establishing the drainage district and from using a drainage ditch theretofore constructed by the joint action of the proper authorities of the counties of Monona and Woodbury. This petition was answered by the defendant named in the caption and by certain of the original petitioners for the ditch, as we understand it. Thereafter the interveners and the objectors to the establishment of the drainage district filed a supplemental petition, in which they asked practically the same relief as in the original petition of intervention. They also filed some additional objections to the establishment of the district not made before the board of supervisors of Woodbury County. The case came on for hearing upon these pleadings and upon the objections filed before the board of supervisors to the establishment of the drainage district, resulting in a dismissal of the appeals and of the petitions of intervention and the confirmation of the drainage district as established by the board. Costs were taxed against the appellants and interveners.

Although counsel have given all the aid possible, we find it very difficult to arrive at a satisfactory conclusion as to the facts. The record contains many photographs, several plats, and many land descriptions, and the witnesses in the lower court, in referring to these, did not indicate the places and matters referred to in such a way

as that they can now be understood when their testimony is reduced to the printed page. It is often impossible to tell what the witness referred to, and without the presence of these witnesses we are often left to surmise and conjecture. The photographs were so marked that we have many times had to guess as to which ones were being referred to. The exhibit marks have been confused, or the witnesses did not correctly identify them. Because of the condition of the record, we have had to go over it many times in order to discover the salient and controlling points, and, if any have been overlooked, it has been due to the fact that much of the testimony taken upon the trial in the lower court can not be reproduced upon the printed page.

It appears that, some years before these proceedings were begun, the boards of supervisors of Monona and Woodbury Counties had, by joint action, established a drainage district composed of lands in the two counties, and pursuant thereto a ditch was dug running through the district, known in this record as the Woodbury and Monona ditch. The north, or upper, end of the ditch is in section 15 of a certain township in Woodbury County, which is included in the district now in controversy, and this with what is known as the Skinner ditch in Woodbury County, which ditch started from the same point as the Woodbury-Monona ditch, were so constructed and designed as to carry the water of Wolf Creek from the point of conjunction of the two ditches either by way of the Skinner ditch southwesterly into what is known as "West Fork Creek," or southerly by the Woodbury-Monona ditch, several miles through Woodbury and Monona Counties, to what is known as the "West Fork River." Each of these ditches was intended to carry its share of the water from Wolf Creek. Prior to the establishment of the Woodbury-Monona district, Wolf Creek lost its channel near the point where the Skinner and Woodbury-Monona ditches join, and

spread out over the bottom land, flowing in no well-defined course, but rendering the land in the bottom swampy, wet, unhealthy, and unfit for cultivation. After the establishment of the Woodbury-Monona ditch, much of the land, up as far as the ditch was constructed, was reclaimed or partially reclaimed, although many times a year, particularly in wet seasons, Wolf Creek would overflow for many miles north of the junction of the two ditches, and the overflow water would come down upon the land in the eastern part of the Woodbury-Monona district, covering it to the depth of many inches and rendering it unfit in many places for cultivation. This Woodbury-Monona district was established, as we understand it, in the year 1899.

Wolf Creek, of which we have spoken, runs off into the hills and bluffs which border what is known as the "Missouri bottom," and is subject to overflow. Its general course is southwesterly, although its channel is very tortuous. At a point in section 14 of the land within the proposed drainage district, it turns abruptly from practically a north and south line directly westward, making a sharp angle on what is known as the "Ed Steinhoff land." This is near the point where it emerges from the bluffs, and from that point down to the Woodbury-Monona ditch its channel becomes less and less perceptible. Its usual wont was to spread out over the bottom following no well-defined channel. Because of its tendency to spread out over the bottom as it emerged from the bluffs, the Woodbury-Monona ditch did not take all the water which came down, but it often spread over the lands to the south and east of section 14, inundating lands not only in this section, but also in sections 23 and 26. At times it also spread over lands in sections 15, 22, and 27. Wolf Creek frequently overflowed its banks from a point where the east and west forks thereof join in section 30 in a township next north of the one which we have been considering, down to where it came out upon the Missouri bottom. Its

length is something like six miles from the forks above de-
scribed, and the valley through which it runs is from three-
fourths to one mile in width.

In the fall of the year 1907, some seventeen owners
of property within a proposed drainage district petitioned
the board of supervisors of Woodbury County for the es-
tablishment of what has since been called the Wolf Creek
district.    The district commenced at the forks of Wolf
Creek and ran south to the south lines of sections 26 and
27, being two and one-half miles south of the north line
of the old Woodbury-Monona district.    It comprised some-
thing like five thousand, nine hundred and sixty acres of
land and embraced something like three thousand, three
hundred acres which were already in the Woodbury-Monona
district.

One Holmvig, the county surveyor of Woodbury
County, was appointed by the board of supervisors to
make a survey, etc., of the proposed district, and with nec-
essary assistants he performed this service, making a
proper plat showing the boundaries of the district, the
main ditch, laterals, etc., and also a report showing the ele-
vations of the land, the depth and size of the ditches, how
they would drain the land, and also a. profile of the ditch
showing the elevations for every one hundred feet.    No
objections were filed before the board to the plat, survey,
or profiles.    The 'main ditch recommended by the surveyor
commenced at the junction of the east and west forks of
Wolf Creek and ran thence in a southwesterly direction
through sections 30, 31, and 36 of one township and· 1,
2, 11, 14, and 23 of the one lying south thereof, and
emptied into the Woodbury-Monona ditch between sections
22 and 23 of the ‚southernmost ‘township of the county,
something like three-fourths of a mile from the upper end
of the Woodbury-Monona ditch.    Several laterals running
into this main ditch were outlined and proposed by the
surveyors; six of them·coming in from the ‘east and south,

and one from the north and west. The main ditch is nearly straight, and it was proposed by the surveyor to convey all the water which had theretofore been carried by Wolf Creek into this ditch. Wolf Creek, as already suggested, is very crooked, and in its natural condition did not convey flood waters with any speed on account of the sinuosity of the stream and the silt, underbrush, and growths therein.

From a point nearly three-quarters of a mile north of where the creek makes an angle on the Steinhoff land to a point nearly a mile south of the old creek channel, the proposed ditch runs in a straight line almost due north and south. The surveyor recommended the establishment of a district outlined by him, and the following is a part of his report: "The area embraced in the proposed district is subject to overflow, and can not be successfully cultivated, is unhealthy and unfit for habitation, and the improvement will drain the different tracts, thereby perfecting the productive and sanitary conditions of the entire district." The estimated cost of the improvement was $22,-877.40. This report was approved by the board of supervisors, and the auditor gave notice to all interested parties of a hearing for April 9, 1908. Thereafter fifteen persons living or owning land within the proposed district, all but three of whom lived or owned lands within the Woodbury-Monona district, appeared and filed objections before the board to the establishment of the new district as a whole, and also filed objections to the inclusion of his land therein. At the April meeting the board heard the testimony offered upon the issues raised by the objectors, and in effect overruled the same, and on May 13, 1908, made an order finding that the improvement was conducive to the public health, convenience, and welfare, and was for the public benefit and utility, and the drainage district recommended by the engineer was declared to be a necessity. Following this, and on the 12th day of June,

1908, the plan for the district recommended by the engineer was approved and adopted, and the drainage district was established.   On June 20th following, thirteen of the objectors jointly and severally appealed to the district court from the action and proceedings of the board.   When the case reached the district court, the county of Monona and the board of supervisors thereof and five other persons owning land outside of the proposed district, but whose lands are in the Woodbury-Monona district, filed a petition of intervention, and thereafter an amendment or supplement thereto, in which supplement the original objectors joined with the interveners.   The petitioners for the ditch and the board of supervisors of Woodbury County answered the petition of intervention, and upon the issues tendered by the several objections, pleadings, etc., the case went to trial in the district court, with the result hitherto indicated.

I.   As we understand it, none of the interveners own land within the limits of the proposed district, and none own land in Woodbury County.   Aside from the county of Monona and the board of supervisors thereof, they do own land within the old Woodbury-Monona district, and they each and all claim that to empty the water from the proposed district, including Wolf Creek, into the Woodbury-Monona ditch, would cause this ditch at the lower end thereof to overflow, and thus flood their lands, destroying the efficacy of their own system of drainage, which was adequate for its purpose, and for which their lands had been assessed and taxed.   There seems to be no authority in the statutes, the practice act, or in the general principles of procedure which obtain in this state for an intervention in the district court in drainage proceedings coming to that court on appeal from the action of the board of supervisors under either section 1947 of the Code or section 1989a6 of the Code Supplement.   The district court in such cases

*1. DRAINAGE: appeal: intervention: jurisdiction.*

acts simply as an appellate tribunal without any original jurisdiction in the premises. As said in *Hartshorn v. District Court,* 142 Iowa, 80: "An appellate court must consider the case on appeal upon the issues before the inferior tribunal"—citing many cases, among them: *Temple v. Hamilton County,* 134 Iowa, 706; *Doubet v. Board,* 135 Iowa, 95. See, also, somewhat in point, *Clary v. Woodbury County et al.,* 135 Iowa, 488. The trial court was right in disregarding and dismissing interveners' petitions. Moreover, the objectors and appellants must be confined on this appeal to the objections filed by them before the board of supervisors. They can not mend their hold by filing a petition in the district court setting up new grounds for defeating the proposed improvements. The cases heretofore cited rule the proposition, and many more analogous precedents might be cited in support of this rule.

II. Interveners being out of the case, we come then to the case as made by the objectors before the board of supervisors of Woodbury County, which we must assume was the matter tried by the district court.

2. SAME: formation of district: petition: number of signers.

We shall take these up in the order followed in appellants' brief and argument. Several of these objections are technical and do not go to the real merits. The first point is that the original petition should have been signed by a majority of the residents of the county owning property within the proposed district, as provided in section 1940 of the Code. It is enough to say, in answer to this, that these proceedings were instituted under chapter 2a of title 10 of the Code, known as Acts Thirtieth General Assembly, chapter 68, as amended by various acts of subsequent Legislatures and appearing in the Code Supplement as sections 1989a1 *et seq.* A petition in such a case need not be signed by more than one landowner within the proposed district. Section 1989a2, Code Supp. Section 1989a47 of

the drainage act now under consideration reads as follows: "The provisions of this act shall be construed as an independent procedure additional to chapter 2, title 10, of the Code and Supplement, relating to the location, establishment and construction of levees, drains, ditches and water courses and shall not be held to repeal any of such provisions." The first section of this act provides: "The, board of supervisors of any county shall have jurisdiction, power and authority at any regular, special or adjourned session, to establish a drainage district or districts, and to locate and establish levees, and cause to be constructed as hereinafter provided any levée, ditch, drain or water course, or to straighten, widen, deepen or change any natural water course, in such county, whenever the same will be of public utility or conducive to the public health, convenience or welfare, and the drainage of surface waters from agricultural lands shall be considered a public benefit, and conducive to the public health, convenience, utility and welfare." Code Supp., section 1989a1. It was under this general section that the petitioners for the district proceeded in this case, and the petition was undoubtedly sufficient to confer jurisdiction upon the board. Moreover, even if a majority of resident landowners were required, we think it sufficiently appears that this number signed the petition.

III. Again, it is said that the county surveyor did not in fact make the surveys himself, but intrusted that important matter to untrained and irresponsible subordinates. It

3. SAME: survey: employment of assistants.

is true that the surveyor appointed by the board did not run all or any great proportion of the levels himself, nor did he measure the distances with his own hand, but he had two assistants who did the necessary work under his directions, and he made some of the surveys himself. The engineer or surveyor drew all the plats and profiles and made and filed a report showing the elevations of the different tracts of

land, depth and size of the main ditch and of the laterals, the termini of the various ditches, and all other matters necessary to give full and accurate information regarding the proposed district. The surveyor had nothing else on hand at this time, and he testified, in part, as follows:

Q. Mr. Holmvig, did you make the survey of this ditch? A. Yes, sir; I done some of it myself and had help. I located the ditch and went along. I didn't take any of cross-sections and levels of this land myself. Q. So far as these figures are concerned that indicate the levels of these lands, you had nothing to do with determining their correctness, did you? A. I told them to go and take the levels and be careful and do it right. Q. I am asking of your personal knowledge, what you know of the correctness of those figures? A. I am willing to say they are correct. I know they are correct. . . . I was appointed by the board to survey this ditch and I made the survey. I had Charlie Jandt to assist me. I was down there part of the time and directed the work while there. I have an office in Sioux City, and the plat was made there under my supervision. I told them what to do. I have been the whole length of this district at different times. Exhibit O is the plat I filed. . . . I was down there when they were surveying a few times. I did none of the surveying only setting stakes for the ditch and telling the boys what to do.

It is manifestly impossible for one man to make a survey such as was required in this case. He must, to some extent at least, depend upon the reports and actions of others who assist, and, having given general directions and gone over the ground setting stakes and actively assisting part of the time in the actual work of running levels, etc., we think a sufficient compliance with the statute is shown. *Zinser v. Board,* 137 Iowa, 665, relied upon by appellants, says nothing to the contrary. *In re Drainage District No. 3,* 146 Iowa, 564, supports our conclusion here.

IV. Contention is made that there is no authority to

include lands already within one drainage district in another; but the law expressly authorizes such a procedure.

4. SAME: territory included in the district.

Section 1989a25, Code Supp. See, also, *Smittle v. Haag et al.*, 140 Iowa, 492. The same rule obtains in other states. *State v. Fuller*, 83 Neb. 784 (120 N. W. 495); *Sturm v. Kelly*, 120 Mich. 685 (79 N. W. 930). It certainly can not be the law that, after the establishment of one district which does not go to the source of the cause of the overflow, another district can not be established which overlaps any part of a previous district. It sufficiently appears that all the land included in the proposed district which is in the old one will receive a benefit from the new district if any part of it will. In other words, if the straightening out of Wolf Creek and the digging of the main ditch and the laterals will take care of the overflow of Wolf Creek and convey all the water of Wolf Creek into the Woodbury-Monona county ditch, the lands of all the objectors will, to some extent, be benefited by the proposed improvement.

V. Something is said about the board of supervisors not having a permanent survey made of the district as provided in section 6 of chapter 68, Acts Thirtieth General Assembly (Code Supp., section 1989a6).

5. SAME: appeal: questions not raised below.

This point does not seem to have been made in the district court, and we need not consider it. If there be anything in the proposition, it might perhaps result in the dismissal of all the appeals because prematurely taken.

VI. Coming now to the real merits of the controversy, we find the principal contentions are: (1) That lands included in the district are not subject to overflow or too wet for cultivation; (2) that the proposed ditch is not a necessity; (3) that no public interest is involved, in that the public health will not be conserved nor the public benefited by the proposed improvement; (4) that the board

had no authority to appropriate and use the Woodbury-Monona ditch as a part of the proposed improvement; (5) that the proposed ditch will ruin lands in the Woodbury-Monona district lying outside the proposed district by causing an overflow of the lands in Monona County abutting upon the Woodbury-Monona ditch; (6) that without a proper petition therefor the board of supervisors could not invade the Woodbury-Monona district; and (7) on the part of individual objectors and appellants that their lands should not have been included within the new district.

In considering the first three of these contentions some legal propositions should first be stated. The law under which these proceedings were instituted provides that the board of supervisors may establish drainage districts, cause to be constructed ditches, drains, and water courses, and straighten, widen, deepen, or change any natural water course whenever the same will be of public utility or conducive to the public health, convenience, or welfare; and it expressly provides that the drainage of surface water from agricultural lands shall be considered a public benefit and conducive to the public health, convenience, utility, and welfare. Now, we have held that the action of the board under this law is largely legislative in character. *In re Drainage Dist. No. 3*, 146 Iowa, 546; *Chicago, M. & St. P. R. Co. v. Monona County*, 144 Iowa, 171; *Ross v. Board*, 128 Iowa, 427; *Temple v. Hamilton County*, 134 Iowa, 706. In the latter case it is said:

6. SAME: establishment of drainage district: review of proceedings.

The authority to pass upon the necessity of such an improvement, determine its public character, and fix the boundaries of the district, is more legislative than judicial in its nature, and is intrusted, primarily at least, to the board of supervisors. That body is to find whether the improvement is one of public utility and conducive to public health and welfare; and when the damages, if any, are appraised, it is then to consider and determine whether

the cost of construction and the amount of damages do or do not create a greater burden than should properly be borne by the land benefited.   If these be found in favor of the petitioners, then it becomes the duty of the board to order the improvement established.   Laws Thirtieth General Assembly, chapter 68, sections 5, 6.   In view of the fact already mentioned that these duties are in a large measure legislative in character, and the further obvious truth that the supervisors are on the ground where they can see and know the situation as no one can know it from the written or printed testimony, we are of the opinion that the court should be very reluctant to interfere and set aside their order on the ground that the ditch is not a work of public utility, or its cost is a greater burden than the lands benefited should bear, unless the evidence in support of the objection is so clear as to render that conclusion unavoidable; and the burden of making such showing is on the party attacking the order.

We have examined the evidence in the light of these rules, and are of opinion that neither the board of supervisors nor the district court erred in establishing the drainage district.   The board had undoubted authority to straighten, widen, deepen, or change the channel of Wolf Creek under proper proceedings, and that this will drain overflow and surface water from all the lands included in the district is, we think, sufficiently shown.   At any rate, appellants have presented no such case as would justify a reversal under the rules heretofore announced by this court.   The engineers agree that the Wolf Creek ditch as recommended by the county surveyor is large enough; indeed, one of them says it is too large.   That it will carry the overflow and surface water down to the junction with the Woodbury-Monona ditch, except in case of unprecedented floods, sufficiently appears.   That its size and fall is sufficient to keep the channel clear is free from reasonable doubt, and we are satisfied that, except in cases of unusual and unprecedented floods, it will take all the water coming down the Wolf Creek valley into the Woodbury-

Monona ditch and save the lands of a majority of the objectors from such overflows as in the past have been common and disastrous. Wolf Creek itself, in its natural condition, will not carry off the water which comes down the valley, and floods have been frequent in the past from the point where it turns at a right angle on the Ed Stein-hoff land, down to the south side of the district as now established where the waters ran into what is known as "Weber Creek" and were conducted by that stream into the Woodbury-Monona ditch.

The board's finding that the plan as established will drain surface waters from the agricultural lands within the district having support in the evidence, we must assume that this is a public benefit and conducive to public health, utility, and welfare.

VII. Aside from the individual appeals, the main question in the case is the right to use and join onto the old Woodbury-Monona ditch. Appellants contend broadly in 7. SAME: drains: the first instance that, although the old ditch outlet. was constructed through and over lands which were lower than those in the proposed new district, and before the construction of any ditches were subject to overflow waters from Wolf Creek, after the construction of the Woodbury-Monona ditch, the upper proprietors had no right in establishing a new district to turn the waters of Wolf Creek into the ditch. If this be the law, then there never can be a district formed out of land above an established drainage district, although all the water from these lands naturally flows over lands within the old district. Such a result could not have been intended by the Legislature, and a careful reading of sections 1989a11, 1989a12, 1989a21, 1989a24, 1989a25, and 1989a54 of the Code Supplement, which are too long to be set out at length in this opinion, makes it clear that a district once established may be extended, parts of the land therein included in another district, natural streams may

be changed, and waters collected in one district of lands higher up the stream may be turned into ditches lower down, and the ditch thus used may be deepened or enlarged to meet the necessities of the case. This being the rule, there is no reason in law why the Woodbury-Monona ditch should not be used as an outlet for the water accumulating on lands in the new district.

VIII.   If there be any valid reason why this should not be done, it is to be found in the peculiar facts of the case rather than from abstract rules of law. Appellants contend that the old Woodbury-Monona ditch, particularly at its south end and all the way through Monona County by reason of its light fall, is now smaller than when con-

8. SAME: who may object to the establish-ment of drain-age district.

structed, and that it does not now carry all the water which it was originally intended to convey, to say nothing of the additional water which will be brought into it from the Wolf Creek district. They also say that the same condition exists in Woodbury County, and particular-ly in that part of the county which is included in the two districts, although, because of the greater fall in the original ditch at this point, it is not so bad as farther down. The testimony shows, without any contradiction, that the original ditch in Monona County is smaller than it was when first constructed, due to the deposit of silt, and that the levees on either side of the ditch have been broken through and bridges spanning the ditch have been washed out from water coming down from above, much if not all of which came from the Wolf Creek valley. It also shows that on account of present conditions tile run into the old ditch did not efficiently drain the lands on either side of the old ditch, especially when the water was high. In other words, claim is made that some of the land abutting on the old ditch in Monona County is as low or lower than the bottom of the ditch.

We may assume, for the purpose of argument, that

the old ditch is not, in its present form and situation, sufficient to take care of the water which it was originally planned to carry, and that the turning of the water from the proposed new Wolf Creek channel will greatly augment the flow. Still we are of opinion that neither Monona County nor any of the landowners therein are proper parties to this appeal. That they have a remedy against any infraction of their rights must be conceded. If no other, they have an undoubted right under sections 1989a11, 1989a12, 1989a21 and 1989a24, to have the original ditch deepened, enlarged, widened, or changed to meet the new situation. That they can not present their claims by petition of intervention in an appeal from the board we have already determined. The only persons who may raise those questions are parties to the original proceedings whose lands are included in the proposed district and who made proper objections before the board of supervisors. See cases already cited bearing upon this proposition and section 1989a46 of the Code Supplement, which reads as follows:

The provisions of this act shall be liberally construed to promote the leveeing, ditching, draining and reclamation of wet, overflow, or (of) agricultural lands; the collection of the assessments shall not be defeated, where the proper notices have been given, by reason of any defect in the proceedings occurring prior to the order of the board of supervisors locating and establishing the levee, ditch, drain or change of natural water course provided for in this act, but such order or orders shall be conclusive and final that all prior proceedings were regular and according to law unless they were appealed from. But if upon appeal the court shall deem it just and proper to release any person or modify his assessment or liability, it shall in no manner affect the right or liability of any person other than the appellant; and the failure to appeal from the order of the board of supervisors of which complaint is made shall be a waiver of any illegality in the proceedings and the remedies provided for in this act shall exclude all other remedies.

The only persons who may complain in this proceeding are landowners whose lands are within the proposed district. As to them the testimony is not sufficient to justify us in holding, as a matter of law, that the plan recommended by the surveyor for the new district will not be sufficient to take care of the water coming from the Wolf Creek valley, and that the old ditch will not convey it without overflow or spill beyond the limits of the proposed new district. The upper end of the old Woodbury-Monona ditch has a fall of two and one-half feet for its first mile and of one and one-half feet to the mile down to the county line, which is one mile below the southern boundary of the proposed district. This old ditch has washed out at its upper end by the action of the water until it is considerably larger than when first constructed. The fall in the new Wolf Creek ditch for a mile and a quarter, just before its junction with the old ditch, is eight and fifty-five hundredths feet per mile. That the body of water coming out of the new Wolf Creek channel or ditch will enlarge the old ditch at least at its upper end, and tend to keep it open because of the increase in the speed and volume of water entering the old ditch, is well established by the testimony. Just now we are not concerned with what becomes of the water in Monona County, as that matter is not properly before us.

*9. SAME: drainage: sufficiency: evidence.*

The trial court may well have found from the testimony that the old ditch was, at the time in question, fifty feet wide on top, twenty-nine feet at the bottom, and nine feet deep at its smallest place in Woodbury County. The water coming down the new Wolf Creek channel will undoubtedly enlarge the old ditch even at that point, as it has already, without being confined to a given channel. That appellant's lands will be relieved from much of the flood water, and that the overflow, whatever it may be, will run off much quicker under the new plan than under the

old, is quite satisfactorily established. In cases of unprecedented floods, it may be that none of the ditches will handle all the water; but they will afford the means whereby the flood will be rapidly carried off, and to that extent at least all the lands included within the new district will be benefited by the improvement.

IX. As to the individual appeals: In several cases it has apparently been held that the inclusion of property within the boundaries of a district is an exercise of legislative power which courts can not review. *Ross v. Board*, 128 Iowa, 427; *In re Dist. No. 3*, 146 Iowa, 564; *Railway Co. v. Monona County*, 144 Iowa, 171. Without now reaffirming this rule, the correctness of which is, to say the least, debatable, we may well quote the following from *Zinser v. Board*, 137 Iowa, 660:

10. SAME: benefits: equalization of assessments: presumption.

> So that the land to be included in the district must derive some benefit from the improvement either in drainage directly, or in being afforded an outlet for the excess of water to be drained therefrom or in accessibility, or the like. *Chambliss v. Johnson*, 77 Iowa, 611. Whether directly affected, or in the means afforded to carry away water gathered through tiling or other ditches, is material only as bearing on the classification by the commissioners. But, if so located that drainage will not benefit it, or so that it will drain quite as well in the lowlands or sloughs as they will through the ditch excavated, and it is not made more accessible, or the like, then it is not benefited within the meaning of the statute. In other words, there can be no assessment on lands merely because of the improvement of others near by. The land itself or its immediate surroundings must be affected by the improvement in order to justify its inclusion in the drainage district. . . . By the language of the statute the land to be included in the district must in some way be affected by the improvement, and, to benefit it, necessarily this must increase its value, either by relieving it of some burden, or by making it adapted for the purpose for which it is used. It is manifest, then, that a prerequisite to the inclusion

of any tract of land in the district proposed by the engineer is that it will in all reasonable probability derive some special benefit from the improvement. If, owing to its location, the construction of a ditch will not drain the land any more or differently than is done by the existing swale or swamp, or render it more accessible, or affect its immediate surroundings, then it is not benefited, even though the ditch carry off the water. When lands are so situated, there is imposed on those below a natural servitude to receive such waters as naturally flow therefrom. The reason for this is that the water naturally descends, so that in the course of nature it must flow from a higher to a lower level, and the owner is entitled to enjoy his property with such natural advantages as are derived from its situation, and is under no obligation to assist the owner of the servient estate to get rid of the water flowing on his land. *Blue v. Wentz*, 54 Ohio St. 247 (43 N. E. 493). See *Beals v. James*, 173 Mass. 591 (54 N. E. 245). So that land may be in the watershed and not be affected by the excavation of the ditch in a way to confer any special benefit, and the evidence in this case shows conclusively that between fifty thousand and eighty thousand acres of land were improperly included in the district.

Again in the *Temple* case, *supra*, it is said:

As already stated, the evidence strongly tends to show that this district or a large part thereof will be benefited in some degree by the ditch. Doubtless some will be benefited much more in proportion than others, and there may be some tracts which will receive no very perceptible benefit; but all these things are subject to adjustment, when the board shall come finally to pass upon the classification of the land and the assessment of the cost of the improvement upon the property within the district. All matters of alleged unequal or improper assessment will then be considered, and the board is authorized upon such hearing to increase, diminish, annul, or affirm the apportionment made by the commissioners. We must presume that they will do their duty in this respect. We think it unnecessary to pursue the discussion.

The testimony fairly shows that all the lands included within the proposed district will be benefited in some degree by the establishment thereof, and the difference in benefits we must assume will be properly adjusted by the board in making assessments against the land. There is some doubt regarding the land owned by Robert and R. J. Haddock, but not enough to justify us in excluding these lands altogether from the district. The testimony shows that a part of their lands, although doubtless a comparatively small part will be benefited by the proposed plan. If the case were triable *de novo,* and it were necessary for us to pass upon the matter as an original proposition, unaided by the testimony and plans of competent engineers, the finding of the board of supervisors, which board has a large discretion in such matters, and the findings and orders of the district court we should have considerable trouble with some features of the case. But, as already said by this court in the *Temple* case, *supra,* the testimony in support of the claims made by the objectors must be so clear as to leave little doubt regarding the invalidity of the order of the board of supervisors.

X.     Lastly, it is argued that the petition filed in the case is insufficient because not in conformity with section 1989a25 of the Code Supplement. There seems to be no merit in this claim. This section of the statute expressly says that the petition shall be the same as for the establishment of an original drainage district. The one which was here filed answered this requirement. As already suggested, it is not for us to indicate at this time what rights Monona County or any of the landowners in that county may have, or to give any intimation as to what remedies, if any, may be open to them. Nor is it necessary that we now say what, if anything, may or shall be done to the old Woodbury-Monona ditch, if after trial it appears that it will not carry the flood waters. Nor is it any part of our

11. SAME: benefits: discretion of supervisors: review.

present duty to say how the expense of widening, deepening, or enlarging the old Woodbury-Monona ditch, if that becomes necessary, shall be met, as these questions are not now before us. Some of them are full· of difficulty in view of the legislation, or want of legislation, upon the subject, and it will be time enough to consider these problems when they arise and are properly presented.

We have gone over the entire record with care, and, in the light of our previous cases, reached a conclusion, which, while not in all respects satisfactory, is the best that can be done under the record as it now stands. This opinion should not be treated as an adjudication of any rights or supposed rights which the interveners or any of them may have. Their petitions are simply dismissed without prejudice.

· The result is that the findings, orders, and judgments of the district court must be, and they are, *affirmed.*