J. H. MAYNE et al., Appellants, v. BOARD OF SUPERVISORS OF POTTAWATTAMIE COUNTY et al., Appellees.

No. 39041.

MARCH 12, 1929.

SUPPLEMENTAL OPINION JUNE 24, 1929.

REHEARING DENIED SEPTEMBER 21, 1929.

*J. J. Hess* and *George H. Mayne,* for appellants.

*John P. Organ,* for appellees.

ALBERT, C. J.—The aforesaid Drainage District No. 2 was established in 1903, and the improvement therein was completed in 1907. Generally speaking, the lands lying in this district are bottom lands along the Missouri River, which, to a large extent, are low, flat, and swampy. Coming from the northeast into said district is what is known as Pigeon Creek. It traverses the district in a southwesterly direction, and empties into the Missouri River, which is, for at least a part of the way, the western and southern boundary of this drainage district. Traversing the district in a northerly and southerly direction is the Northwestern Railroad, and paralleling it, about a mile west, is the Illinois Central Railroad. These roads converge, after they pass about the center of the district, and approach each other very closely at or near the south line of the district. The aforesaid Pigeon Creek originally crossed the Northwestern Railroad property under a bridge about a mile and a quarter south of the north line of the district. It runs in a southwesterly and southerly direction between these two railroads, and crosses the Illinois Central about three miles south of the north line of the district. The flowage in this stream is from the northeast to the southwest.

The improvement constructed commences in Pigeon Creek at a point about a quarter of a mile northwest of the center of Section 13, and from there it conducts the water in Pigeon Creek in a southerly and southwesterly direction, crossing the Northwestern Railroad about a mile and a half south of the point where the original Pigeon Creek crossed it. At that time, after crossing the railroad fill, it made an abrupt angle to the south, paralleling the Northwestern Railroad, and continuing in a southerly direction across the Illinois Central, thence into the Missouri River.

After the completion of this improvement, the Northwestern Railroad filled its bridge where Pigeon Creek originally crossed it, and certain other bridges between that point and the place where the new improvement crosses, making a solid embankment, which protected the land lying west of said railroad from any overflow from Pigeon Creek. This new improvement, as originally constructed, was approximately 26 feet wide at the bottom and 46 feet at the top, with spill banks on either side, which acted as levees in time of high water. After the completion of the improvement, and in pursuance of law, the cost of said ditch was assessed to the various tracts of land in District No. 2.

In 1910, another drainage district was laid, immediately to the northeast of No. 2, known in the record as Drainage District No. 8, following Pigeon Creek Valley. The ditch in No. 8 emptied into the head of the formerly constructed ditch in District No. 2. The improvement in No. 8, when completed, was something over 11 miles in length. It straightened Pigeon Creek, which, owing to the sinuosity of streams, was much longer than the completed ditch.

While there is some dispute in the evidence, we think it may fairly be said that the ditch constructed in Drainage District No. 2 was sufficient to take care of the water in that district in ordinary seasons; but after the waters from the ditch in District No. 8 were thrown into it, the trouble began. It is fair to say that the ditch in No. 2 was not large enough to take care of the waters naturally coming into it plus the additional water concentrated into it by Drainage District No. 8. The result was that the ditch in No. 2 was at some places filled with silt and debris, the banks were eroded, and the ditch was widened at the head to a width of about 72 feet on top by the action of the water, the

levees or spill banks were washed away at various places along the line of the improvement, and the lower lands were flooded. The matter seems to have been a source of constant trouble, and efforts were made at various times by the board to remedy it, much money was expended, trying to obtain relief, additional work was done and a second assessment was paid in Drainage District No. 2 for work done on the improvement; but the desired relief was not obtained.

After this second assessment, the board spent about $27,000, previous to July, 1924, and some $37,000 after that date, to relieve the situation. The ditch at some places was widened, and as a final solution of the problem, it was determined that the levees on either side of the ditch which helped to carry the water in seasons when the water was more than the ditch could carry, were moved back some distance on either side and reconstructed. The dirt for these new levees, under the evidence, seems to have been taken from the sides of the original ditch, thus widening the channel by the amount of dirt necessary to construct these levees.

In 1925, the board of supervisors ordered all of the land in District No. 2 to be reclassified, and proposed to and did levy the total amount against the various lands in that district, consisting of all of the money expended on the improvement after the second assessment and up to the time of this action by the board. Objections were filed and hearing was had on the assessment report by the commissioners, but they were confirmed by the board, and on appeal were confirmed by the district court; and it is from the latter action that this appeal is taken.

The most serious question in the case is that raised by the appellants: to wit, that Drainage District No. 8 should be charged with a part of the cost of these various pieces of work  done on the ditch in Drainage District No. 2. The appellees answer this question by saying that it was never raised before the board of supervisors by way of objections, and that, because of failure so to raise the question, under the familiar rule in these matters, objection was waived. With this contention of the appellees' we cannot agree. We have repeatedly stated that, in proceedings of this kind, technicalities and exactness in pleadings and objections are not required. The only purpose in requiring these written objec-

tions to be filed is that the contentions of the objectors may be brought to the attention of the board in the first instance, so that the board may consider the same and pass thereon. The evidence in the case shows that, a short time before the date set for the hearing on this question of assessment, all of the landowners in District No. 2 joined in what they called "a petition" to the board of supervisors, calling attention to the situation, and asking that, in spreading the assessment, a part of the same should be charged to the land in Drainage District No. 8.

While, of course, there is no provision in the statute for the filing of such a petition, we feel that this brought the question before the board, and, their attention being called to the fact that these landowners were insisting that part of the cost of the improvement should be paid by the land in District No. 8, this is a sufficient presentation of this question to the board, even though it is not specifically set out in the objections filed; but it is sufficient to warrant a review of this question.

The first case coming before this court involving anything of a similar nature to the case before us is *Prichard v. Board of Supervisors*, 150 Iowa 565; but the only question involved in that case was the question of whether or not, when the lower district was established and the improvement completed, another district could be established above it, which threw its waters into the improvement in the lower district; and we there held that such proceedings were permissible. That case in no way involved any question of assessment, but the simple question of the primary right to construct the upper ditch.

Section 25, Chapter 68, Laws of the Thirtieth General Assembly (Section 1989-a24, Code Supplement, 1913) provides:

"When two or more districts shall have their outlet or discharge into the same natural watercourse or stream and it shall become necessary to deepen or enlarge said natural watercourse or stream, each district shall be assessed for the cost of such work in the same ratio to such total cost as the discharge of waters of such district bears to the combined discharge of waters of the several districts emptying into said natural watercourse or stream; but no district shall be liable to contribute for any improvement or costs and expenses incurred in improving said

natural watercourse or stream above the point of discharge of the waters of such district into the same.''

In 1919, by Chapter 332, Acts of the Thirty-eighth General Assembly, the following was enacted:

''When it shall become necessary hereafter to clean out, enlarge, deepen or widen any ditch or drain of any levee or drainage district; which ditch or drain has heretofore been established and constructed or which shall hereafter be established or constructed, and into or through which any of the waters of any other levee or drainage district shall flow, each levee or drainage district flowing annually into or through such other levee or drainage district, including the levee or drainage district carrying the combined discharge of water, shall be assessed for the cost of such work in the same ratio to such total cost as the discharge of waters of such district bears to the combined discharge of waters of the several districts flowing into or through such a ditch or drain. And when it shall become necessary hereafter to extend any ditch or drain of any levee or drainage district for a better outlet for the waters flowing annually into or through such a ditch or drain so extended for a better outlet, each district, including the district carrying the combined discharge of water, shall be assessed for the cost of such work in the same ratio to the total cost as hereinbefore provided.''

These two laws were in operation until the adoption of the Code of 1924, which went into effect in October of that year. By reference to Section 1989-a24, it is to be noticed that it is there said that, when ''it shall become necessary to deepen or enlarge said natural watercourse or stream, each district shall be assessed for the cost of such work,'' etc. Under the Code of 1924, this law seems to have been gathered into two sections, designated as Sections 7563 and 7564, reading as follows:

''7563. When two or more drainage districts outlet into the same ditch, drain, or natural watercourse and the board determines that it is necessary to clean out, deepen, enlarge, extend, or straighten said ditch, drain, or natural watercourse in order to expeditiously carry off the combined waters of such districts, the board may proceed as provided in the two preced-

ing sections. Each district shall be assessed for the cost of such work in proportion to the benefits derived.

"7564. For the purpose of ascertaining the proportionate benefits, the board shall appoint commissioners having the qualifications of benefit commissioners, one of whom shall be an engineer, to determine the percentage of benefits and the sum total to be assessed to each district for the improvement."

Under Section 7563, it will be noted that, when "it is necessary to clean out, deepen, enlarge, extend, or straighten said ditch, drain, or natural watercourse in order to expeditiously carry off the combined waters of such districts, the board may proceed as provided in the two preceding sections."

Section 7564 provides that the commissioners shall determine the percentage of benefits and the proportionate share to be assessed to each district for the improvement. It will be noted by  comparison that each of these laws contemplated that, where the two drainage districts use a common outlet, each must bear a proportionate share of the cost of the improvement of such common outlet. The method of determination is different under these statutes. The first statute provides for a division of the cost between the two districts on a basis of the water furnished by the district, and the last statute provides for such division on a basis of benefits. It is apparent from the record that all of the expenditures made hereon, or at least the contracts therefor, were made before the Code of 1924 went into effect, although the assessment on which attack is made, was made after that time. The rights of the respective parties, therefore, were fixed before the Code of 1924 went into operation, and must be determined under the law as it then existed. The commissioners in this case charged nothing whatever against the territory lying in Drainage District No. 8. In this they erred, and failed to comply with the statutory requirements in such matters.

Appellees seek to avoid this situation by claiming that the work done was wholly repair work, and therefore did not come within these provisions of the statute. With this contention we

 cannot agree. The evidence abundantly shows that the improvement in Drainage District No. 2, after the construction of No. 8, was wholly inadequate to take care of the water brought down by the improvement in No. 8. The evidence shows beyond dispute that, after the improvement in No. 8 was constructed, water was brought there in larger amounts and more rapidly than it came in its natural state, and thereby largely destroyed the improvement in No. 2 and its effectiveness to accomplish the purpose intended in the construction of that ditch; and that the work done in No. 2 was wholly to meet this condition; and that the ditch was widened and new levees built on either side to protect the lands in Drainage District No. 2 from overflow. It does not answer the question by simply calling it "repairs," as claimed by the appellees.

The construction of these ditches in most parts of the state was with the thought that the spill bank on either side of the ditch was intended to take care of the water when there was more of it in the ditch than it could handle. In other words, it made an additional ditch above the ground, and is all a part of the same improvement.

The lower court turned his decision in this case largely on the doctrine that the servient estate is bound to take care of the water coming from the dominant estate. This whole matter is governed by statutory regulation, and the general doctrine of servient and dominant estate has no application to this theory of the matter.

One other question needs attention, being a question raised by individual landowners, involving this situation: They owned certain land which was within the district and bounded by the  Missouri River, at the time the original ditch was laid. Of course, the drainage district, as originally laid, could not include the land under the Missouri River. Since the district was originally established, there have been accretions to tracts of land; and as the boundary line as originally established was the then high-water mark of the Missouri River, land that has accreted since that time would be outside of the boundary line of the district, and not subject to assessment.

For the reasons herein suggested, the case is reversed and

remanded, with direction that the board reassess said land in accordance with the holdings made in this opinion.—*Reversed and remanded.*

Stevens, De Graff, Morling, and Wagner, JJ., concur.

### Supplemental Opinion.

Per Curiam.—In the petition for rehearing, our attention is called to one point which we failed to dispose of in the original opinion filed herein. It appears that, when this assessment  was made, it was preceded by an order that the land be reclassified. It further appears that it was reclassified on the basis of the natural topography of the land as it existed prior to the construction of any of the improvements in this district. This was error. It should have been classified on the condition of the land as it existed just prior to and at the construction of the improvement for which the assessment was being made.

With this addition, the petition for rehearing is overruled.